**Fox Estate**

Before Klein, A. J., Bolger, Saylor, Shoyer, Pawelec and Silverstein, JJ.

*Catherine R. Barone, Michael von Moschzisker, Israel Packel,* for exceptants.

*John L. Harrison, Jr.,* and *Snyder & Bent,* contra.

SHOYER, J., June 18th, 1973.—Before us are the Commonwealth's exceptions to the decree of the learned hearing judge who sustained the inheritance tax appeal filed by the Estate of Alexander M. Fox, deceased, from a collateral inheritance tax appraisement dated July 30, 1971.

Testator died March 17, 1914. Under his will and codicils he left his residuary estate in trust with direction to pay the income to his wife for life, and on her death one-half of the income to be paid in perpetuity in equal shares to four named charities. As to the remaining one-half share, testator provided that the trustee should continue to hold this corpus in trust for the lives of his two stepchildren until the death of the survivor of them, at which time the income from said one-half remaining share was also made payable in perpetuity to the same named charities as the first one-half share. At the time of testator's death, Pennsylvania imposed no tax on lineals but only on collaterals. This tax was imposed under the Act of May 6, 1887, P. L. 79. By the Act of April 22, 1905, P. L. 258, the legislature provided that stepchildren should be treated as lineals. See Commonwealth v. Randall, 225 Pa. 197 (1909).

Following the death of testator, no inheritance tax forms were filed, but following the widow's death, which occurred on July 30, 1941, inheritance tax forms were filed and the first appraisement was made by the Commonwealth on March 19, 1942. This appraisement valued the total principal as of July 30, 1941, the date of death of the widow. Tax of five percent was assessed on one-half of the principal going to the charities, because charities had always been treated under the tax law as collaterals. An additional tax due on a collateral annuity was also assessed at that time.

No tax was assessed on the one-half which continued to be held in trust for the stepchildren, nor was any express reservation of the right to tax this half upon the death of the stepchildren reserved to the Commonwealth. It is because of the failure of the Commonwealth to *expressly reserve* the right to tax the balance of the corpus after the termination of the life estates of the stepchildren that the trustee has opposed the imposition of a tax at this time.

Following the death of the surviving stepchild, trustee filed its account and claimed that no additional inheritance tax was payable. By adjudication of Judge Lefever, the auditing judge, dated February 4, 1970, the court awarded the funds to the trustee "subject to such additional collateral inheritance tax at rate of 5% (rate in force at death of testator) as may be due, if any." Thereafter, the Commonwealth filed its "collateral remainder appraisement" on July 30, 1971, appraising the one-half value of the trust funds, less deductions allowed, at $384,453.36, and assessed tax at five percent, amounting to $19,222.67 with interest to run "from date of distribution to date of payment."

The learned hearing judge sustained the tax appeal of the trustee and in an opinion and decree dated February 7, 1972, he directed that the appraisement of July 30, 1971, be stricken. Exceptions subsequently filed by the Commonwealth were dismissed pro forma by our court en banc, and the matter referred back to the hearing judge for reconsideration. In this connection, a rehearing was held and on June 16, 1972, the hearing judge issued an amended opinion and decree once again sustaining the appeal and directing that the appraisement be stricken. The Commonwealth's exceptions to this opinion and decree of June 16, 1972, are now before our court for disposition.

In his earlier opinion, the learned hearing judge said:

"It has long been the established law of Pennsylvania that an inheritance tax appraisement is final and can be changed only on a timely appeal. Where future interests are disclosed to the appraiser, and the payment of tax is to be withheld until they vest in possession, the Commonwealth must expressly reserve the right to make its appraisal at the future time."

In his opinion to which the present exceptions were filed, the learned hearing judge was guided by the opinion of this court in Altemus Estate, 44 D. & C. 2d 499, 505, 18 Fiduc. Rep. 304 (1968). He distinguished Carver Estate, 422 Pa. 609 (1966), which was urged upon him by the Commonwealth as being controlling. The learned hearing judge stated:

"In the instant case likewise, the facts are different from those in Carver Estate, and the ruling therein does not apply. In this instance the Commonwealth had the opportunity either to appraise the entire estate in 1941, when all assets thereof were revealed to it, or expressly to reserve the right to appraise and assess the tax at a later time. It did neither. The appraisal of 1941 was not appealed from and it is final."

Both the Commonwealth and the trustee have carefully and exhaustively briefed the issue before us. Since the trustee agrees with the learned hearing judge that the crucial issue is the failure of the Commonwealth to have expressly reserved its right to reappraise upon the termination of the life estates held by the two stepchildren, we turn our attention to that issue.

Section 3 of the Collateral Inheritance Tax Act of 1887 provides as follows:

"In all cases where there has been or shall be a devise, descent or bequest to collateral relatives or

strangers, liable to the collateral inheritance tax, to take effect in possession, or come into actual enjoyment after the expiration of one or more life estates, or a period of years, the tax on such estate shall not be payable, nor interest begin to run thereon, until the person or persons liable for the same shall come into actual possession of such estate, by the termination of the estates for life or years, and the tax shall be assessed upon the value of the estate at the time the right of possession accrues to the owner as aforesaid: Provided, That the owner shall have the right to pay the tax at any time prior to his coming into possession, and, in such cases, the tax shall be assessed on the value of the estate at the time of the payment of the tax, after deducting the value of the life estate or estates for years; And provided further, That the tax on real estate shall remain a lien on the real estate on which the same is chargeable until paid. And the owner of any personal estate shall make a full return of the same to the register of wills of the proper county within one year from the death of the decedent, and with that time enter into security for the payment of the tax to the satisfaction of such register; and in case of failure so to do, the tax shall be immediately payable and collectible."

Section 12 of the Act of 1887 provides:

"It shall be the duty of the register of wills of the county, in which letters testamentary or of administration are granted, to appoint an appraiser as often as and whenever occasion may require, to fix the valuation of estates, which are or shall be subject to collateral inheritance tax; and it shall be the duty of such appraiser to make a fair and conscionable appraisement of such estates; and it shall further be the duty of such appraiser to assess and fix the cash value of all annuities and life estates growing out of said

estates, upon which annuities and life estates the collateral inheritance tax shall be immediately payable out of the estate at the rate of such valuation: Provided, That any person or persons, not satisfied with said appraisement, shall have the right to appeal, within thirty days, to the orphans' court of the proper county or city on paying or giving security to pay all costs, together with whatever tax shall be fixed by said court; and, upon such appeal, said courts shall have jurisdiction to determine all questions of valuation and of the liability of the appraised estate for such tax, subject to the right of appeal to the Supreme Court as in other cases."

It should be noted that the above-quoted sections do not say that the appraiser shall make one appraisement which shall be final, nor do they say that if he does not appraise a future interest at the time he makes an appraisal of the life estate, the Commonwealth thereafter is barred from claiming tax on the remainder unless there has been an express reservation of the right to make a second or subsequent appraisement. On the contrary, it is provided in section 3 that where there is a future interest liable to the collateral inheritance tax "to take effect in possession, or come into actual enjoyment after the expiration of one or more life estates or a period of years, the tax on such estate shall not be payable, nor interest begin to run thereon, until the person or persons liable for the same shall come into actual possession of such estate, by the termination of the estates for life or years, and the tax shall be assessed upon the value of the estate at the time the right of possession accrues to the owner as aforesaid." The words "shall not be payable" mean only "shall not be demandable" by the Commonwealth: Pickering Estate, 410 Pa. 638, 643 (1963); DeBorbon's Estate, 211 Pa.

623, 624 (1905). Since it is so clearly stated that the Commonwealth has no right to demand the tax on the remainder while the life estate endures, and an appraiser is to be appointed as often as required, it is inescapable that the act contemplates a reappraisement when the future estate has taken effect in actual possession. The learned hearing judge conceded as much when he said: "The holding in Carver's Estate, supra, seems to be that certainly in estates which include future interests, two or more inheritance tax appraisements may be necessary and even mandatory." Yet, he preferred to follow our decision in Altemus rather than that of our Supreme Court in Carver, and, therein, we think he fell into error.

In Carver Estate, 422 Pa. 609 (1966), the Inheritance Tax Act of June 20, 1919, P. L. 521, 72 PS §§2301-2307, was involved, since the testator died later that same year. As comparison with the Act of 1887 will show, there is no significant difference in the provisions pertaining to the issue before us.

We take the statement of the facts in Carver from the opinion of President Judge van Roden in the court below, where they are more fully reported: 15 Fiduc. Rep. 437 (1965). In 1906, decedent had placed the sum of $40,000 in trust with the income payable to settlor for life and then to his wife. The deed named his brother, Charles, as trustee. Although this same Charles was named executor of the will, he did not disclose the existence of the trust in the inventory which he filed with the register of wills. The appraisement did not include the remainder interests under the 1906 deed of trust and, consequently, no inheritance tax was assessed or paid on those interests. In a letter to the register of wills enclosing the check for the tax bill, the executor's attorney did make mention of the trust assets.

In 1963, upon the death of decedent's wife, an accounting of the inter vivos deed of trust was filed, whereupon the register of wills appraised the remainder assets and assessed an inheritance tax at the applicable rate.

Appealing this appraisement, the trustees of the trust and the will contended that full disclosure of the trust assets had been made at the time of decedent's death. While the trustees conceded that the Commonwealth might expressly reserve a decision on any particular item in the estate, it was contended that the Act of 1919 required the Commonwealth to include all taxable items in a single appraisment and, in the absence of such reservation, only fraud, accident or mistake would permit the Commonwealth to appraise at a later date an item not included in its original appraisement.

The Commonwealth's argument before the lower court was twofold: (1) That full disclosure of assets was not made at decedent's death, and (2) that the proper time for appraising the remainder interest is not at decedent's death but when the remaindermen come into possession at the death of decedent's widow. The lower court made no finding on the first proposition but found "the Commonwealth's second proposition controlling."

In this posture of the case, the lower court noted that the Commonwealth was making no claim for tax on the widow's life estate. It then held that the appropriate time to appraise a future interest was either at the time the remainderman exercised his statutory option to prepay the tax or, absent such election, at the time the remainderman comes into actual possession or enjoyment.

In so holding, the lower court followed the reasoning of Pickering Estate, 410 Pa., supra, at 644, where

our Supreme Court in construing the Act of June 20, 1919 stated:

"There is not the slightest doubt that, contrary to the contention of the Commonwealth, a tax is not demandable by the Commonwealth, nor can it compel a remainderman to pay inheritance tax on his future remainder interest *at or as of testator's death.* The tax is payable *at the election,* not of the Commonwealth, but, *of the owner* when he comes into actual possession or at his election 'at any time prior to his coming into possession.' " (Italics in original.)

Our Supreme Court in Carver affirmed the holding of the lower court and said, at page 613:

"As a reading of this section of the Act makes clear, the inheritance tax imposed upon future interests is to be based upon the value of those interests at the time the ultimate owner either prepays the tax or actually comes into possession or enjoyment of the property. Thus, an appraisal of the value of such interests at any other time would constitute *a meaningless act.* Even if the Commonwealth had appraised the remainder interests under the 1906 deed of trust at the time of decedent's demise, as appellants contend it was required to do, a second appraisement would now be required in order to comply with the statutory direction that the tax be assessed 'upon the value of the estate at the time the right of possession accrues to the owner.' Act of June 20, 1919, P. L. 521, §3, 72 P.S. §2304. In the instant case, the right of possession did not accrue until the expiration of the interest of decedent's wife in 1963. It was, therefore, not until that time that *an appraisal of any legal significance* could have been made by the Commonwealth. We are unable to adopt a construction of the Act of 1919 which would place upon the Commonwealth the duty to engage in an appraisement of future interests which would be

binding upon neither itself nor the ultimate owner of the interest applied. Pickering Estate, 410 Pa. 638, 190 A. 2d 132 (1963) . . ." (Italics supplied.)

Administrative Judge Klein of our court recently dismissed the appeal of the taxpayer in the Estate of James M. McCahan, deceased, of April term, 1925, no. 1689. The Commonwealth had there made successive appraisals in connection with the widow's life estate of 60 percent and the daughter's life estate of 40 percent, which increased to 50 percent upon the death of the widow. Judge Klein held himself bound by the rule of Carver Estate and that the essential issue must be not a "specific reservation" by the Commonwealth but "whether under all of the attendant circumstances we can reasonably conclude that the Commonwealth intended the appraisement to be final and conclusive."

In McCahan, the taxpayer relied heavily on Altemus Estate just as it does here. We approve and quote from Judge Klein's opinion disposing of Altemus as a case where the facts warranted a finding that the Commonwealth intended its original appraisement to be final.

"Appellant lays great stress on Altemus Estate, 44 D. & C. 2d 499 (1968), decided by this Court after Carver. In our opinion Altemus is inapposite and readily distinguishable. Altemus died in 1912, leaving a portion of his residuary estate in trust to pay the net income to a granddaughter for life and upon her death to pay the principal to her issue, and in default of issue as she would appoint by will. In 1912, the Commonwealth filed two inheritance tax appraisements, the first on certain legacies and the second on a small annuity. Neither appraisement reserved the right to make further appraisements. This Court held that the two appraisements, taken as a whole, appear to have been intended as a *final* appraisement. The appraiser did not value or assess a tax on assets passing into the

trust for the granddaughter, because he apparently assumed that no tax was then due or could thereafter become due in view of the fact that the life tenant and primary remaindermen were lineals, and that when Altemus died, no inheritance tax was payable on property passing to lineal descendants. Because the two appraisements were intended as final, it was held that the fact that the life tenant died without issue and exercised her power of appointment in favor of designated charities, did not give the Commonwealth the right to impose the additional taxes it claimed.

"The Hearing Judge went to great pains to distinguish the facts in Altemus from those in Carver. He concluded that the factual differences were significant, that Carver dealt with a different statute, and that because Carver represented a significant departure from prior case law it should be limited to its facts. The court en banc likewise concluded that the facts in Altemus were vitally different from those in Carver and dismissed the exceptions of the Commonwealth. The Commonwealth did not take an appeal and we can only speculate as to what the Supreme Court decision might have been. It is clear, however, that the basic rationale of Altemus is that the Commonwealth intended the initial appraisements to be final and was consequently bound by them."

President Judge Taxis, of Montgomery County, in two recent opinions, Blake Estate, 23 Fiduc. Rep. 19 (1972) and Estate of William H. Beeson, Dec., no. 43812 of 1973, Court of Common Pleas, Orphans' Court Division, Montgomery County (not reported), followed the basic rule of finality as set forth in Reynolds Estate, 359 Pa. 616, 620 (1948), where the court said:

"When an appraisement and assessment *purport** to be a final determination of the value of the *property*

*appraised*\*\* and the *rate assessable*\*, the assessment and appraisement are conclusive except on appeal, even though it may subsequently appear that a mistake in judgment had been made either as to the value of an asset or the rate of tax." (\* Italics supplied.) (\*\* Italics in original.)

In neither Blake nor Beeson was there an express reservation by the Commonwealth of the right to file a later appraisement although in Blake the appraisement did contain the statement, "Remainder not taxed at this time." In holding that an express reservation was unnecessary, Judge Taxis made the following comments in Blake which we wholeheartedly approve . at page 22:

"This [specific reservation by the Commonwealth of the right to reappraise] undoubtedly is . the best practice and should effectively prevent controversies such as the present one. This practice was first approved by appellate court decision in Reynolds Estate, 359 Pa. 616.

"A careful reading of Reynolds Estate shows that the rule under discussion is but a logical application of the principles of res judicata to inheritance tax appraisements. The reservation of a specific right to reassess is one way to show that an assessment is not final, but nothing in the cases requires us to hold that it is the only way.

" [A]s long as the initial assessment clearly shows that it is not final, there can be no objection to a subsequent reassessment."

Judge Taxis then held (page 24) that "the computations of the tax due even without [the above quoted] language [deferring tax on the remainder], show that this assessment was not final."

Beeson Estate construed the Act of June 20, 1919, P. L. 521, which placed a tax on direct heirs, but its

section 3 is not significantly different from section 3 of the Act of 1887. The opinion reads, page 7:

"It is clear from the wording of the Act and its application that an inheritance tax appraisement under the Act of 1919 has two functions. It (a) fixes the value of the assets subject to tax, and it also (b) determines the extent of the liability of such assets to tax. Altemus Est., supra, 307. It follows from this, therefore, that unless an appraisement, as prepared and filed, purports to or does in fact encompass both of these functions, it is not final. A conclusion of finality, or the lack of it, can usually be reached from the face of the appraisement itself, but it may also result from a consideration of the law and the facts involved in an individual case."

And again, at page 13:

"We think that the 1937 appraisement was clearly not intended to be final and that its omission of any reference to the remainder was because no tax was then due on that interest and no party had chosen to prepay. Every knowledgeable party in interest was on ample notice that the tax assessed and paid in 1937 was not and could not have been the entire tax liability for this estate. This case contrasts sharply with those wherein second appraisements seek to reappraise and impose additional tax upon interests which were previously not only valued but assessed with tax at a rate which subsequent events showed to be incorrect."

The statement by the learned hearing judge in the instant case that "it has long been the established law of Pennsylvania that an inheritance tax appraisement is final and can be changed only on a timely appeal" owes its origin to the case of Commonwealth v. Freedley's Executors, 21 Pa. 33 (1853). Moneypenny's Estate, 181 Pa. 309 (1897), followed Commonwealth v. Freedley and stated the rule that "in the absence of fraud,

accident or mistake, [there cannot] be a second appraisement of property for the purpose of the collateral inheritance tax." In order to properly apply this rule, we must be cognizant of the various tax statutes which were in force at the time our appellate courts gave expression to the rule.

In Commonwealth v. Freedley, the court was construing the Act of April 10, 1849, as amended by the Act of March 11, 1850. The Act of 1849 imposed an immediate tax on remainders *which were valued at the time of testator's death.* The Act of 1850 gave relief to "oppressed" remaindermen by permitting them to "elect to wait their coming into actual possession" of their estates before the Commonwealth could demand payment, provided that, in the case of personal property, the remainderman must post security for later payment of the tax with six percent interest. The court said, at page 36:

"That the assessment of the appraiser is to be final, if not appealed from, is shown by the Act declaring that it is made 'to *fix* the valuation of the real estate' —that the appraisement of the personal estate is to be 'fair and conscionable,' and that the tax on annuities, and life estates, is to be 'immediately payable out of the estate at the rate of said valuation.' But property subject to the tax may be fraudulently concealed, accidentally overlooked, or may not be known to the representatives of the decedent at the time of the appraisement, and, therefore, the Register is to appoint an appraiser 'as often as, and whenever occasion may require.' Whenever portions of the estate come to light after the first appraisement, they are to be appraised in the same manner, but as to such portions as were the subject of appraisement, the 'clear value' is fixed, and the law assesses the tax of five per cent. Like the assessment of taxes for state and county

purposes, the property subjected is, first, to be found, then valued and appraised, and then taxed; but, instead of officers assessing a rate of taxes on the ascertained property, and valuation according to the public necessities, the law, in this instance, assesses a fixed rate."

In Moneypenny's Estate, 181 Pa. 309, supra, the taxpayer died in 1854 and in the same year an appraiser was appointed and the collateral inheritance tax on personal property assessed and paid. Twelve years later, when real estate in New York was sold pursuant to testator's direction, the Commonwealth attempted a supplemental appraisement. Our Supreme Court said, at page 313: "The statutes do not contemplate or provide for more than one appraisement. On the contrary the intent is that the first shall be complete and final." Then, referring to the hardship alleviated by the Act of 1850, the court continued, at page 314:

"Even by this act however nothing was postponed but the date of compulsory payment. The tax was still left due upon the testator's death, was still to be included in the appraisement and was to bear interest until paid. To avoid misunderstanding it may be well to note that the present case arose *before the act of 1887, and any changes introduced by that act are not discussed.*" (Italics supplied.)

Grossman and Smith in their 1971 revision of Pennsylvania Inheritance and Estate Tax, supply this historical note, section 506-1: The Acts of "1826 P. L. 227 and 1849 P. L. 570 imposed an immediate tax on remainders, which were valued at the time of the testator's death . . . 1850 P. L. 170 permitted the remainderman to elect to pay tax when he came into actual possession, provided that proper security was given. 1855 P. L. 425, 1887 P. L. 79, 1917 P. L. 832 and

1919 P. L. 521 all enlarged the remainderman's privilege to allow an election to pay tax at any time prior to his coming into actual possession, providing that the valuation date was to be the date of payment (with deduction of the value of then-existing preceding estates); the latter three acts also expressly provided that where remainder tax was not paid until the remainderman came into possession (i.e., the date of the life tenant's death: . . .) the valuation would be as of that date without deduction for prior estates . . .

"Thus, a remainder was valued at the time when payment could be demanded by the Commonwealth under the law in effect at the testator's death (or under later retroactive statutes—e.g., the Acts of 1850, 1855 and 1887 . . . ) or at the time the remainderman elected to prepay the tax. An election to prepay, before the termination of prior limited estates, resulted in a valuation of the remainder which deducted the then-value of the prior estates from the then-value of the property . . . Where, because of a power of consumption in the trustees in favor of the widow life tenant, the Register was unable to ascertain what portion of the estate was taxable at a 2% rate and what portion was taxable at a 10% rate, the court held it proper for him to reserve the right to make a re-appraisement at the death of the life tenant: Reynolds Est., 359 Pa. 616 (1948) . . . However, where tax was assessed and paid at the 2% rate without reservation of the right to impose additional tax, no additional tax could be assessed."

Under the Act of 1887 and previous collateral inheritance tax statutes, the appraisement served the dual purpose of (1) determining the taxability of the transfer, and (2) fixing the clear value of the property subject to tax. Carver Estate has made it clear that, where future interests are obviously involved, the

ascertainment of clear value must be postponed until the remainderman is ready to pay the tax. So also may determination of taxability be deferred by the Commonwealth so long as it does nothing by its earlier appraisement to mislead the taxpayer into the nirvana of finality. This was made clear by our Supreme Court as long ago as 1899 in Coxe Estate, 193 Pa. 100, 105, where the court said:

"It is perfectly clear that those persons who do not take their estates until after the determination of a preceding life estate *are not subject to any liability for the tax until they come into actual possession of their estates* . . . If the tax shall not be payable until that event, *it does not arise, it has no beginning,* and hence the commonwealth has no title to it and cannot demand its payment until the estate itself 'comes into actual possession' of the person entitled." (Italics supplied.)

Here, the charities knew when they came into actual possession of one-half the estate at the death of testator's widow, that they were paying collateral inheritance tax on that one-half only, and that payment on the other one-half would await the death of the stepchildren, unless they elected to make payment of that tax beforehand. Neither the trustee nor the charities claim to have been misled by the calculation or assessment of the tax as these items are stated clearly and precisely on the face of the 1942 appraisement above the signature of the appraiser.

Nor do they claim they were deceived by the hand-printed endorsement, "No Further Tax Due" which appears haphazardly on the back of the appraisement, without signature, initials or date. Although the appraisement is a public document, no presumption of authenticity or regularity can rise to bind the Commonwealth by such an irregular marking. In Carver

Estate, the statutory docket kept by the register of wills was marked "Paid in full" and in Menough Estate, 76 York 166 (1962), "Tax Paid in Full" was entered in the register's docket. In both cases, the disputed appraisement was allowed, President Judge Kohler, of the Orphans' Court of York County, ruling (page 171) that: "Presumption of payment applies to the Commonwealth, as it does to the ordinary suitor; however, such presumption cannot run until the tax was demandable and it was not demandable until the termination of the life estate."

We are completely satisfied that the Commonwealth is entitled to its supplemental appraisement and its remainder tax. The State should not be deprived of what is justly owing for want of a superfluous reservation. "Taxes are what we pay for civilized society": Compañia General v. Collector, 275 U. S. 87 (Holmes, J., dissenting, page 99, 100 (1927)).

For the reasons set forth above, the exceptions of the Commonwealth are sustained and the appeal of Provident National Bank, trustee under the will of Alexander M. Fox, Jr., deceased, from the assessment of inheritance tax and interest is dismissed.